UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JULIAN FRANCIS BATES,

      Plaintiff,

v.                                Case No. 23-11071

GENERAL MOTORS, INC.,           Sean F. Cox
                                  United States District Court Judge

      Defendant.

_____/

**OPINION AND ORDER**
**GRANTING DEFENDANT'S SUMMARY JUDGMENT MOTION**

Following his termination from his position as an engineer, Plaintiff filed this

employment discrimination action against Defendant, his former employer. Discovery has

closed and the matter is before the Court on Defendant's summary judgment motion. The parties

have briefed the issues and the Court concludes that oral argument is not necessary. Local Rule

7.1. For the reasons set forth below, the Court GRANTS Defendant's summary judgment

motion and dismisses all claims asserted in this case with prejudice.

**BACKGROUND**

Acting *pro se*, Plaintiff Julian Francis Bates filed this action against the following three

Defendants: 1) General Motors, Inc. ("GM"); 2) Bruce Van Vliet; and 3) Carol Carleton. The

claims against the two individual Defendants, however, were dismissed for failure to effect

service. (ECF No. 11). Thus, GM is the only remaining Defendant.

The operative complaint is Plaintiff's original Complaint. (ECF No. 1). In it, Plaintiff

asserts the following four counts against Defendant GM: 1) "Racial Discrimination," in violation

1

of Title VII (Count I); 2) "Racial Discrimination," in violation of 42 U.S.C. § 1981 (Count II); 3)

"Racial Discrimination" in violation of Michigan's Elliott Larsen Civil Rights Act ("ELCRA")

(Count III); and 4) "Gender Discrimination" in violation of Title VII (Count IV).

Defendant's December 21, 2023 Witness List identified several lay witnesses, including

Bruce Van Vliet, Matthew Kiser, Michelle Hicks, and James Schweikert.  (ECF No. 13).

Plaintiff's December 21, 2023 witness list also included those same individuals as witnesses, and

added Shannon Meyers, a Human Resources employee at GM, and others.  (ECF No. 14).

At the request of both parties, discovery was extended, as was the date for filing

dispositive motions.  The parties jointly advised the Court that the extensions were necessary, in

part, because Plaintiff has "only been available to take depositions after working hours,

beginning at 4:30 pm" and "Defendant has worked to provide the individuals Plaintiff requested

within Plaintiff's time limitations."  (ECF No. 41).

Both parties filed motions to compel during discovery.  Those motions have all been

resolved.  Although he filed other motions to compel discovery in this case, Plaintiff did not file

a motion seeking to compel the depositions of any witnesses in this case.

Following the close of discovery, Defendant GM filed the pending summary judgment

motion.  (ECF No. 42).

This Court's practice guidelines are included in the Scheduling Order and provide,

consistent with Fed. R. Civ. P. 56 © and (e), that:

> a.  The moving party's papers shall include a separate document entitled
> Statement of Material Facts Not in Dispute.  The statement shall list in separately
> numbered paragraphs concise statements of each undisputed material fact,
> supported by appropriate citations to the record. . .
>
> b.  In response, the opposing party shall file a separate document entitled

Counter-Statement of Disputed Facts.  The counter-statement shall list in separately numbered paragraphs following the order or the movant's statement, whether each of the facts asserted by the moving party is admitted or denied and shall also be supported by appropriate citations to the record.  The Counter-Statement shall also include, in a separate section, a list of each issue of material fact as to which it is contended there is a genuine issue for trial.

c.  All material facts as set forth in the Statement of Material Facts Not in Dispute shall be deemed admitted unless controverted in the Counter-Statement of Disputed Facts.

(Scheduling Order at 2-3).

In support of its motion, Defendant GM filed a "Defendant's Statement of Material Facts Not In Dispute."  (ECF No. 42-27, "Def.'s Stmt.").  In response, Plaintiff filed his "Counter-Statement Of Disputed Facts" (ECF No 46, "Pl.'s Stmt.") and contested some, but not all, statements.  The undisputed statements are deemed admitted.

The relevant evidence submitted by the parties, construed in the light most favorable to Plaintiff, is as follows.

Plaintiff Julian Francis Bates is an African American man.  On February 22, 2021, Defendant GM hired Plaintiff as a Powertrain and Electification Component Validation Engineer ("CVE").  (Pl.'s Dep. at 88; Def. & Pl.'s Stmts. at ¶ 1).

CVEs in this group were responsible for planning and executing testing to validate components of vehicle parts in the powertrain and electrification systems (i.e. battery technologies, electric motors/drive units, transmission gears, pumps, valve bodies, etc.).  (Def. & Pl.'s Stmts. at ¶ 2).

Carol Carleton (a female) interviewed[1] and decided to hire Plaintiff at GM.  (Carleton

---

[1]Plaintiff's Declaration states that when he was interviewed for the position, Carleton interviewed him, along with another unnamed member of the engineering group.  (ECF No. 47 at

Dep. at 83-84).

At the time that Plaintiff was hired, Carleton reported to Jamie Richards (a male) and oversaw the Validation Engineering Group Managers ("EGMs").  Richards was the Director of the Powertrain and Electrification group.  Bruce Van Vliet (a male) was an EGM and reported to Carleton.  (Def. & Pl.'s Stmts. at ¶ 4-6).

Van Vliet supervised eleven CVEs, including Plaintiff.  (Def. & Pl.'s Stmts. at ¶ 7).  Of those eleven CVE's, three were African American:  Plaintiff, Ernie McCutchen and Athena Hall). (Van Vliet Decl. at ¶ 19).  Only four of those eleven CVE's were female.  (*Id.*).

After Van Vliet's retirement from GM in March of 2022, Carleton became Plaintiff's supervisor and remained so until his termination.  (Pl.'s Dep. at 89; Van Vliet Decl. at 2).[2]

GM requires all new engineers to be DFSS certified and complete the first step, a "green belt," during the first year of hire.   DFSS project requirements were taken into account when distributing work to new CVEs.  Plaintiff's responsibilities as a CVE included testing and validating vehicle parts so they could go into production. The parts were designed by or with the supplier who would ultimately manufacture the parts for GM. Design Release Engineers, ("DREs"), were responsible for the design of the vehicle parts and CVEs determined the type of validation testing or analysis needed to ensure designs worked.  CVEs received Engineer Change Requests ("ECRs") that modified a design/part. CVEs had to (1) determine if testing was needed, (2) the type of testing, (3) create the testing and (4) have the part tested to validate that it worked.

¶ 3).  The Declaration does not identify the race or gender of that unnamed individual.

[2]Given his retirement, Van Vliet was not employed by GM during this case.

4

(Def. & Pl.'s Stmts. at ¶ 10-16).

CVEs were required to prepare Analysis Development and Validation ("ADV") Plans that explained the testing or analysis needed for each particular part/component, and the status of the testing. CVEs created ADV Plans for new designs and modifications to existing designs. CVEs had deadlines by which to complete testing. (Def. & Pl.'s Stmts. at ¶ 18, 19 & 21).

Once testing validation was complete, CVEs signed off using a GM3660 form and attached their ADV plan so that the part could move to the next phase of production. CVEs attended Product Development Team (PDT) meetings with their suppliers where they could share information about the parts including design changes and information needed for developing and conducting tests. (Def. & Pl.'s Stmts. at ¶ 22-23).

GM had a written description of the CVE position and the job duties include attending supplier meetings. (ECF No. 42-3).

Van Vliet assigned senior CVE, James Schweikert, to mentor Plaintiff. (Def. & Pl.'s Stmts. at ¶ 25).

In June of 2021, Van Vliet conducted Plaintiff's 2021 mid-year review. (Def. & Pl.'s Stmts. at ¶ 26). That review was put into a written "2021 Mid-Year Performance Review" report as to Plaintiff. (ECF No. 42-7). In it, Van Vliet stated that Plaintiff was being assigned additional components, such as "shafts, hubs and flanges," that would give him "an opportunity to show his organizational skills" and develop his "One Team behavior." (*Id*. at PageID.566). Van Vliet also stated that:

> I have assigned James Schweikert to mentor him and help him work through anything he has needed help on. I know James recently set up a weekly review meeting with Julian to help him with working through any issues he has. Julian has not embraced this method and has declined multiple meetings or ended the

meetings early. I think Julian will need to leverage these meetings with James to ensure he understands exactly what items he is responsible for and to ensure his ADV Plans are correct. This will become even more critical as he digs deeper into his new components.

(*Id*. at PageID.566-67).

Van Vliet gave Plaintiff a written "2021 Year-End Performance Review." (ECF No. 42-12). In it, Van Vliet stated that "Julian was hired in February 2021 as a [CVE] to validate the components in the Gears/Shafts Power Transfer PMT. In Julian's Mid-Year Evaluation it looked like Julian was on track in this role, with only some minor issues understanding the processes we use to validate our components." (*Id*. at PageID.591-92). He continued that "[j]ust prior to shutdown, with the departure of our TRACK Engineer, Julian was given the responsibility for additional components to bring his workload to a level similar to other CVEs in the group. To help him be successful, I had another CVE set up a weekly meeting with Julian to answer any questions he had about GM processes and to give him technical advice." (*Id.* at PageID.592). Van Vliet documented a number of performance problems:

Areas that Julian had challenges with and only Partially Met Expectations.

After our Mid-Year Evaluation is when Julian's struggles with the below behaviors and results started to become more evident.

It's On Me (Improvement needed) - Julian had signed off ECRs without attaching the required final ADVP&R files. To resolve this, I asked Julian to set up a meeting with the DRE and their manager, to discuss the possible solutions. We determined that an additional Supplemental ECR needed to be written to link this file to the original ECR. Three weeks later, Julian repeated this same behavior of not attaching the final ADVP&R at Execute 30.

Julian gave a validation status presentation in the Ultium ADV Mtg and it did not include all of the correct content. Julian also attended a Gamma3 shaft deviation review meeting that focused on the PPQP documentation to be signed by him. Then a few days later, he had to be reminded to sign the PPQP document. He didn't remember even being in the meeting even though the attendee log

6

showed he was present. After this meeting, I set up weekly 1 hour meetings with Julian to answer any questions he may have and to review his work. This along with the 1 hour weekly meeting another CVE was having with Julian, resulted in 2 hours/week being mentored. Julian then proceeded to ask the CVE to cancel his weekly meetings going forward, because he didn't see the value in them. Another example was, during the Grx ADV Meeting, Julian presented his FOR status and was then asked if he was new because his report out did not include the correct information and he was unable to give testing status for his plans.

One Team (Improvement Needed) - Julian has had issues completing his tasks in the ECR process on time. An example of this was on the change to increase the torque capacity to 900 Nm on the 10L90. This change had joint responsibility between 3CVEs, with another CVE leading and owning the overall plan, with Julian being responsible for several lines. After multiple meetings, Julian failed to update his line items that were flagged, thus resulting in a CVE updating them for him. When HR and I met with Julian. Julian did not have an acceptable reason why he was late on his plan items and continued to place the blame on others for why he was late. He is not engaged during Validation Review Meetings. He still doesn't understand that every time he is late on a task, he affects the schedule of others that have dependent tasks in the ECR process.

Julian has continued to miss due dates on his ECRs and still struggles to understand the process flow of his ECRs. This has been explained to him multiple times and it is still not clear that he understands. His ability to technically comprehend his role has been on the borderline. He fails to see that he has tasks that are in his ECR inbox that are past due. He has continued to try and place responsibility for this on other colleagues, saying that they did not follow the process or the ECM system had errors or not working properly, even though these tasks are in his inbox and are overdue. He does not seem to grasp the meaning of the behavior of It's On Me.

(*Id*. at PageID.592-94).  Van Vliet gave Plaintiff an overall rating of only "Partially Achieves Expectations"[3] and stated that "To help facilitate a positive improvement of Julian's deficiencies, we will initiate Plan for Improvement."  (*Id*. at PageID.594).

All performance reviews are subject to a calibration process in November and December each year.  During the calibration process EGMs, senior managers, directors, Human

---

[3]Plaintiff contends that this is the "worst possible performance rating."  (Compl. at ¶ 18; Pl.'s Stmt. at ¶ 36).

Resources ("HR") and other leaders in the engineering organization meet to compare the EGM's evaluations and ensure EGM's are grading all engineers on a consistent scale. (Def. & Pl.'s Stmts. at ¶ 37-38). Plaintiff's performance rating was confirmed and finalized before the end of the year in 2021. (Def. & Pl.'s Stmts. at ¶ 39). Plaintiff received his 2021 year-end Performance Evaluation a couple months later in February 2022. (Def. & Pl.'s Stmts. at ¶ 40).

Plaintiff was the only CVE supervised by Van Vliet that received a "partially meets expectations" performance rating. (Van Vliet Decl. at ¶ 19).

On or about February 8, 2022, Van Vliet held a team meeting with his CVEs. At that meeting, Matthew Kiser made a joke about taking on Schweikert's work while Schweikert went on paternity leave. After the meeting, Plaintiff told Van Vliet that he felt Kiser's comment was inappropriate and Van Vliet disagreed. On February 9, 2022, Plaintiff emailed the HR Business Partner assigned to Van Vliet's group, Michelle Hicks and informed her about Kiser's comment and Van Vliet's response. (Def. & Pl.'s Stmts. at ¶ 46-49).

On February 14, 2022, Van Vliet and Hicks met with Plaintiff and discussed his 2021 year-end Performance Review and placed him on a PFI. (Def. & Pl.'s Stmts. at ¶ 45).

Plaintiff's eight week PFI began on February 15, 2022. Plaintiff met with Van Vliet, Hicks and Carleton each week to show how he improved on his "Observed Deficiencies" identified as: (1) Poor Quality of Work Product, (2) Failure to Meet Timelines for Deliverables, (3) Ineffective Communications and Conflict with Others, (4) Failure to Present at Meetings When Scheduled, and When Attending Unable to Provide Complete Status Update. (Def. & Pl.'s Stmts. at ¶ 50-51).

8

A chart depicting how Plaintiff performed throughout the eight weeks of his PFI is located at ECF No. 42-15).  (Def. & Pl.'s Stmts. at ¶ 52).  Plaintiff was rated each week based on his performance: Red meant Plaintiff had not shown any improvement, Yellow meant Plaintiff had shown some improvement, and Green meant Plaintiff had shown sufficient improvement. Van Vliet led Plaintiff's PFI until March 15, 2022. Van Vliet made detailed notes of each week's meeting listing what was discussed and the basis for each week's color ratings. (Def. & Pl.'s Stmts. at ¶ 53-55).

During the March 15, 2022 meeting, Van Vliet explained why Plaintiff was being rated "red" for deficiency no. 1—poor quality of work product, and Plaintiff and Van Vliet shared the following words:

| | |
|---|---|
| JULIAN BATES: | So why is it red? |
| BRUCE VAN VLIET: | Incorrect forms that I just talked about.  One, two, three, four, five, six of your examples were all in incorrect forms.  Some were missing requirement titles.  And your 3660s did not have a proof of validation letter.  That's why it's red. |
| JULIAN BATES: | I think a lot of this is subjective, but I thought I did it right. |
| BRUCE VAN VLIET: | It's – to me it's black and white.  I don't know how it's subjective.<br>You did – so the next one I think you met your due dates, your meeting with the suppliers, you're taking ownership; I think you did all that right.  I mean, I would color that one green. |
| JULIAN BATES: | Thanks. |
| BRUCE VAN VLIET: | Carol, would you agree? |
| CAROL CARLETON: | Yeah. I'm okay with that. |

9

(Def. & Pl.'s Stmts. at ¶ 45; Pl's Ex. 3).

On March 22, 2022, Carleton took over the lead on Plaintiff's PFI due to Van Vliet retiring and she continued to take detailed notes of Plaintiff's performance.  On April 12, 2022, after the eighth week, Carleton determined that Plaintiff did not improve to successfully exit the PFI.  On May 9, 2022, Carleton met with Plaintiff and advised him that due to his poor performance, she decided to terminate his employment.  (Def. & Pl.'s Stmts. at ¶ 57-59).

Plaintiff filed this action against Defendant GM on May 5, 2023, proceeding *pro se.*

During his deposition in this case, Plaintiff testified that he filed a discrimination charge with the Equal Employment Opportunity Commission ("EEOC") after his termination from GM.  (Pl.'s Dep. at 54).  Plaintiff further testified that  his EEOC charge included only race discrimination claims and gender discrimination claims:

> Q.   And so at least when you filled out this form, your allegations were that
>       General Motors discriminated against you based on your race, correct?
> A.   Correct.
> Q.   And your sex, correct?
> A.   Yes.
> Q.   And those are the only claims that you had raised in this document,
>       correct?
> A.   Yes.  That's what it says.

(Pl.'s Dep. at 58-59).

## STANDARD OF DECISION

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *Peffer v. Stephens*, 880 F.3d 256, 262 (6th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986)).

As the party bringing the summary judgment motion, GM "has the initial burden of informing the district court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts." *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003) (citation omitted).  When a motion for summary judgment is properly made and supported and the nonmoving party fails to respond with a showing sufficient to establish an essential element of its case, summary judgment is appropriate. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The Sixth Circuit has explained that "Rule 56 places an affirmative duty on the nonmovant to cite to 'particular parts of materials in the record' to establish that a particular fact cannot be supported or is genuinely disputed. Fed.R.Civ.P. 56(c)(1); *see Chicago Title Ins. Corp. v. Magnuson*, 487 F.3d 985, 995 (6th Cir.2007)." *Emerson v. Novartis Pharm. Corp*., 446 F. App'x 733, 734 (6th Cir. 2011).  "District courts need not independently comb through the record and establish that it is bereft of a genuine issue of material fact before granting summary judgment." *Emerson, supra*.

When a non-movant contends that it lacks sufficient discovery to respond to a summary judgment motion, the Federal Rules of Civil Procedure provide an avenue for relief.  Fed. R. Civ. P. 56(d) is titled "When Facts Are Unavailable to the Nonmovant" and provides as follows:

> If a nonmovant shows by affidavit or declaration that, *for specified reasons, it cannot present facts essential to justify its opposition*, the court may:
>
> (1) defer considering the motion or deny it;
>
> (2) allow time to obtain affidavits or declaration or to take discovery; or
>
> (3) issue any other appropriate order.

Fed. R. Civ. P. 56(d) (emphasis added).  "Beyond the procedural requirement of filing an

affidavit, Rule 56(f)" requires "that a party making such a filing indicate to the district court its

need for discovery, what material facts it hopes to uncover, and why it has not previously

discovered the information." *Cacevic v. City of Hazel Park*, 226 F.3d 483, 488 (6th Cir. 2000)

(citations omitted).

## ANALYSIS

### I.   Plaintiff's Assertion About Not Being Afforded Adequate Discovery In This Case Is Without Merit.

Defendant's summary judgment motion was filed after the close of discovery.

Plaintiff filed his response brief in opposition to the motion on August 1, 2024.  In it,

Plaintiff includes the following:

> NOW COMES, Plaintiff, Julian Bates for his response to General Motors LLC (hereafter "GM" or "Defendant") Motion for Summary Judgement. (ECF No. 42). It has to be noted that the Defendant promised that they would allow the Plaintiff to take deposition of all the requested GM employees, however the Defendant broke their promise and the Plaintiff could not retrieve all of the evidence he requested. Plaintiff Exhibit 19. Bates' Declaration ¶ 13, pg. 5. Therefore, "the plaintiff has [not] had a full opportunity to conduct discovery." *Street v. J.C. Bradford & Co.* 886 F.2d 1472 (6th Cir. 1989).

(Pl.'s Br., ECF No. 45, at PageID.718).  Along with his response brief, Plaintiff submitted a

Declaration that includes the following paragraph:

> 13.   I asked the Defendant could I depose Van Vliet several times in this matter before the close of discovery. Defendant's legal counsel, Ogletree PLLC, did not inform me that they were submitting testimony from Bruce Van Vliet in this matter and therefore I did not have an opportunity to cross examine Van Vliet. Therefore, I was surprised to see declarations from Van Vliet in the Defendant's Motion for Summary Judgement. I also was not given opportunity to depose Matthew Kiser, James Schweikert, Michelle Hicks and Shannon Meyers due to the Defendant filing their dispositive motion.

(ECF No. 47).

The Court rejects Plaintiff's argument that he has not been afforded sufficient discovery in this case.

Generally, summary judgment is improper if the non-movant is not afforded a sufficient opportunity for discovery. *Mattingly v. R.J. Corman Railroad Group, LLC*, 90 F.4th 478, 492 (6th Cir. 2024) (citations omitted). As explained in *Mattingly*, however:

> In the context of a motion for summary judgment, "[t]he non-movant bears the obligation to inform the district court of his need for discovery" by complying with Federal Rule of Civil Procedure 56(d). *Id*. at 1148–49. An affidavit pursuant to Rule 56(d) "must 'indicate to the district court [the non-movant's] need for discovery, what material facts it hopes to uncover, and why it has not previously discovered the information.' " *Doe v. City of Memphis*, 928 F.3d 481, 490 (6th Cir. 2019) (quoting Ball, 385 F.3d at 720). If a non-movant fails to comply with Rule 56(d), the issue of whether summary judgment was prematurely entered because additional discovery was required is not preserved for appeal. *See Vance*, 90 F.3d at 1149; *see also Plott v. Gen. Motors Corp., Packard Elec. Div.,* 71 F.3d 1190, 1196 (6th Cir. 1995).

*Id*. at 492.[4]

Thus, to the extent that Plaintiff submitted his Declaration under Fed. R. Civ. P. 56(d), it is deficient as it does not apprise the Court of what material facts Plaintiff would hope to uncover if he were afforded additional discovery. And Plaintiff's stated reasons for not taking the depositions at issue are belied by the record. Plaintiff has been on notice that Defendant intended to call Bruce Van Vliet, and the others referenced above, as a witnesses since December of 2023. Plaintiff identified Shannon Meyers on his own December 21, 2023 witness list. Although he filed other motions to compel discovery in this case, Plaintiff did file a motion

---

[4]Despite his *pro se* status, Plaintiff is aware of the requirements under Fed. R. Civ. P. 56(d), as his failure to file a sufficient affidavit was raised and discussed in a prior employment discrimination case filed by plaintiff in this district. *See Bates v. American Axle & Mfg., Inc.*, 2018 WL 5095054 at *7 n.4 (E.D. Mich. 2018) (citing *Cacevic, supra*).

to compel the depositions of any witnesses but could have done so.

## II. The Court Grants Summary Judgment In Defendant's Favor As To All Four Counts Asserted In Plaintiff's Complaint.

Defendant's summary judgment motion addresses all of the counts that are raised in

Plaintiff's complaint.

### A. Race Discrimination Claims Under Title VII, § 1981, And ELCRA

Claims of race discrimination under § 1981 and the ELCRA are analyzed under the same

standards as claims of race discrimination under Title VII. *Bates v. American Axle & Mfg. Inc*.,

2019 WL 4941946 at *2 (6th Cir. 2019) (citing *Jackson v. Quanex Corp.,* 191 F.3d 647, 658 (6th

Cir. 1999). To survive summary judgment and proceed to trial on his race discrimination claim,

Plaintiff may rely on either direct or circumstantial evidence. *Id.*

#### 1. Direct Evidence

"Direct evidence is that evidence which, if believed, requires the conclusion that

unlawful discrimination was at least a motivating factor in the employer's actions.*" Peeples v.

City of Detroit,*, 891 F.3d 622, 633 (6th Cir. 2018). It is evidence "that proves the existence of

fact without requiring any inferences." *Rowan v. Lockheet Martin Energy Sys., Inc*., 360 F.3d

544, 548 (6th Cir. 2004).

Here, Plaintiff's response brief asserts that he has "direct evidence" that he was

terminated due to his race – his supervisor's use of the words "it's black and white" during a

meeting with Van Vliet wherein Plaintiff's performance was being discussed. (Pl.'s Br. at 9).

During the conversation at issue, Plaintiff's supervisor noted some specific problems with

Plaintiff's work, Plaintiff responded he thought those items were "subjective," and his supervisor

disagreed using the expression "black and white:"

14

| | |
|---|---|
| JULIAN BATES: | So why is it red? |
| BRUCE VAN VLIET: | Incorrect forms that I just talked about.  One, two, three, four, five, six of your examples were all in incorrect forms.  Some were missing requirement titles.  And your 3660s did not have a proof of validation letter.  That's why it's red. |
| JULIAN BATES: | I think a lot of this is subjective, but I thought I did it right. |
| BRUCE VAN VLIET: | It's – to me it's black and white.  I don't know how it's subjective. |

(Pl.'s Ex. 3).

During his deposition, Plaintiff testified that Van Vliet's above "it's black and white" comment was "kind of provocative," and may have some kind of "subliminal meaning."  (Pl.'s Dep. at 276).  When asked whether the expression used by Van Vliet was a common phrase used to express something being clear versus subjective, Plaintiff testified that the phrase "can mean multiple things."  (*Id.*).

Van Vliet's above comment does not constitute direct evidence that Plaintiff was terminated due to his race.  Again, with direct evidence, no inferences are permitted.  The evidence must require the conclusion that unlawful discrimination was at least a motivating factor *without any inferences*.  Here, inferences would be required to somehow connect Van Vliet's "it's black and white" comment to a discriminatory animus.

## 2.     Circumstantial Evidence Approach

When a plaintiff lacks direct evidence, he can proceed under the circumstantial evidence approach under the familiar *McDonnell Douglas* burden-shifting framework.  *Bates v. American Axle, supra* at *2.

15

Under that framework: 1) the plaintiff must establish a prima facie case of discrimination; 2) the burden then shifts to the defendant to offer a legitimate, nondiscriminatory basis for its actions; and 3) if the defendant satisfies its burden, the plaintiff must establish that the employer's proffered reason is pretextual. *Upshaw v. Ford Motor* Co., 576 F.3d 576, 584 (6th Cir. 2009).

In order to establish a prima facie case of race discrimination, Plaintiff must produce evidence that: 1) he is a member of a protected class; 2) he suffered an adverse employment action; 3) he was otherwise qualified for the position; and 4) he was replaced by someone outside the protected class or treated differently than a similarly situated, non-protected employee. *Deleon v. Kalamazoo Cty. Rd. Comm'n*, 739 F.3d 914, 918 (6th Cir. 2014).

Here, it is undisputed that Plaintiff is a member of a protected class (African American) and that he suffered an adverse employment action (termination). For purposes of the pending motion, Defendant also does not challenged the third element. Thus, only the final element is contested in the pending motion.

To establish that final element, Plaintiff must establish that: 1) he was replaced by someone outside the protected class, or 2) he was treated differently than a similarly situated, non-protected employee. *Id.*

Plaintiff has not presented the Court with any evidence to show that he was replaced by someone outside of the protected class of African Americans. Moreover, Defendant has offered evidence to establish that Plaintiff was not replaced. (*See* Carleton Decl., ECF No. 42-18 at PageID.624, "After Plaintiff was terminated his work was dispersed among existing CVEs."). In the Sixth Circuit, a person is not considered replaced when his duties are absorbed by another

16

person or when the work is redistributed among other existing employees.  *See Geiger v. Tower Auto*., 579 F.3d 614, 623 (6th Cir. 2009).

That leaves Plaintiff to show that he was treated differently than a similarly situated, non-protected employee.

To do so, Plaintiff must "show 'that he and his proposed comparators were similar in all relevant respects and that he and his proposed comparators engaged in acts of comparable seriousness.'"  *Bates v. American Axle, supra*, at * 2 (citing *Bobo v. United Parcel Serv., Inc.*, 665 F.3d 741, 751 (6th Cir. 2012)).

In his response brief, Plaintiff attempts to support his race discrimination claim based on direct evidence.   (Pl.'s Br. at 4-6 addressing "Racial Discrimination").  This portion of his response brief does not attempt to show that any similarly-situated non-protected employees engaged in acts of comparable seriousness and were not terminated.   But other portions of Plaintiff's submissions appear to reflect that he offers James Schweikert and Matthew Kiser as similarly-situated white employees who engaged in acts of comparable seriousness and were treated more favorably:

> Regarding being treated differently than similarly situated employees, Plaintiff argues that James Schweikert and Matthew Kiser were similarly situated because they also made mistakes in the ECR system as CVE's, but since they were formerly design release engineers ("DRE") at GM, they had privileges to edit the ECR's without the help of the rest of the team. The Plaintiff did not have DRE privileges in the ECR system like Schweikert and Kiser that they used to correct their mistakes. Bates Declaration ¶ 11, pg. 4-5. Plaintiff Exhibit 17. Therefore, Schweikert and Kiser are similarly situated because their acts, or mistakes in the GM ECR system, were of "comparable seriousness," but they had the privilege to correct mistakes unlike the Plaintiff.

(*See* ECF No. 46 at PageID.763); (*see also* Pl.'s Br. at 18, asserting that Van Vliet "let similarly situated white employees, Matthew Kiser and James Schweikert, argue during a staff meeting.")

17

When a termination is disciplinary in nature, the plaintiff must show that his proposed comparators engaged in acts of "comparable seriousness." *Wright v. Murray Gurad, Inc.*, 455 F.3d 702, 710 (6th Cir. 2006). To make this assessment, the Court looks to factors such as whether the individuals have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it. *Id.* (citations omitted).

Schweikert are both CVEs who, like Plaintiff, reported to Van Vliet (and then Carleton). But Plaintiff does not demonstrate that either of these two comparators engaged in acts of comparable seriousness as those Plaintiff engaged in, yet were not terminated.

Plaintiff was never disciplined or admonished for arguing during a meeting. Thus, his reliance on the baby/paternity-leave comments between Kiser and Schweikert is misplaced. Those comments are not comparable conduct to Plaintiff's performance deficiencies.

And Neither Schweikert nor Kiser were given an overall performance rating of only "partially achieves expectations" or placed on a written Plan For Improvement ("PFI"). Such differences in disciplinary history and evaluations show that Schweikert and Kiser are not similarly situated. *See, eg., Tennial v. United Parcel Svc., Inc.*, 840 F.3d 292, 304 (6th Cir. 2016); *Campbell v. Hamilton Cty.*, 23 F. App'x 318, 325 (6th Cir. 2001); *Okakpu-Mbah v. Postmater Gen. of United States*, 2022 WL 3928534 at *5 (6th Cir. 2022) (citing *Shah v. General Elec. Co.*, 816 F.2d 264 (6th Cir. 1987) (We "have held that a plaintiff is not similarly situated to employees where their 'work records and evaluations' were not 'similar.'"); *Bates v. American Axle, supra*, at *3. Plaintiff's 2021 Year-End Performance Review, and the PFI he

was placed on afterwards, reflect that Plaintiff's performance problems went well beyond making sign-off errors in the ECR system.  Plaintiff had *several documented performance deficiency areas*, including 1) Poor Quality of Work Product, 2) Failure to Meet Timelines for Deliverables, 3) Ineffective Communications and Conflict with Others, and 4) Failure to Present at Meetings When Scheduled, and When Attending Unable to Provide Complete Status Update. Plaintiff has offered no evidence that Schweikert or Kiser engaged in the same conduct or conduct of comparable seriousness.

Accordingly, Plaintiff has failed to create a genuine issue of material fact as to a prima facie case that he was terminated because of his race.

In addition, even if Plaintiff could do so, that would not aid him because he has not made the required pretext showing either.

Under the *McDonnell Douglas* framework, if the plaintiff establishes a prima facie case of race discrimination, then the burden then shifts to the defendant to offer a legitimate, nondiscriminatory basis for its actions.  If the defendant does so, then the plaintiff must establish that the employer's proffered reason is pretextual.  *Upshaw v. Ford Motor* Co., 576 F.3d 576, 584 (6th Cir. 2009); *Bates v. American Axle, supra*, at *2.

Here, Defendant has offered a legitimate nondiscriminatory basis for its actions – "Plaintiff's subpar work performance in 2021."  (Def.'s Br. at 21).

So the burden of production shifts back to Plaintiff to show that Defendant GM's stated reason were pretextual.  Where, as here, a case is at the summary judgment stage, a plaintiff seeking to prove discrimination via indirect evidence must submit sufficient evidence from which a reasonable jury could conclude that the defendant's legitimate, nondiscriminatory

reasons for its actions are a pretext for unlawful discrimination. *Vincent v. Brewer*, 514 F.3d 489, 494 (6th Cir. 2007).

A plaintiff can refute the legitimate, nondiscriminatory reason that an employer offers to justify an adverse employment action by showing that the proffered reason: 1) had no basis in fact; 2) did not actually motivate the defendant's challenged conduct; or 3) was insufficient to warrant the challenged conduct. *Wexler v. White Fine Furniture*, 317 F.3d 564, 576 (6th Cir.2003); *Manzer*, 29 F.3d at 1084. The first type of showing consists of evidence that the proffered bases for the termination never happened (i.e., that they are factually false). With respect to the second kind of showing, "the plaintiff argues that the sheer weight of the circumstantial evidence of discrimination makes it 'more likely than not' that the employer's explanation is a pretext, or coverup." *Id*. The third showing consists of evidence that other employees, particularly those not in the protected class, were not fired even though they engaged in similar conduct. *Id.*

Here, Plaintiff attempts to establish pretext by virtue of the following evidence: 1) Van Vliet's "it's black and white" comment; and 2) the fact that Van Vliet announced his retirement approximately a week after Plaintiff's February 9, 2020 email complaint about the baby/paternity-leave comments.  (*See* Pl.'s Br. at 6).

Plaintiff's February 9, 2020 email complaint had nothing whatsoever to do with race or racial discrimination.  And no reasonable jury could find Defendant's stated reason for discharging Plaintiff (ie, his deficient work performance) to be a pretext for unlawful race discrimination by  virtue of Van Vliet's use of the words "it's black and white," during the single conversation at issue.

20

The Court concludes that Plaintiff has not presented sufficient evidence from which a jury could reasonably reject Defendant's stated reason as a pretext for unlawful racial discrimination.  Defendant GM is entitled to summary judgment.

**B.      Reverse Gender Discrimination Claims Under Title VII And ELCRA**

Plaintiff alleges that he was terminated based upon his gender, in violation of Title VII and Michigan's ELCRA.  In order to survive summary judgment and proceed to trial on his gender discrimination claim, Plaintiff may rely on either direct or circumstantial evidence.

In response brief, Plaintiff does not attempt to rely on any direct evidence of gender discrimination. That leaves the circumstantial evidence approach.

Notably, however, the Sixth Circuit has "modified" the traditional *McDonnell Douglas* framework "for reverse-discrimination claims filed by members of a demographic majority.  In that circumstance, the plaintiff may only rely on the *McDonnell Douglas* scheme to prove a prima facie case of discrimination if he can show that his employer 'is that unusual employer who discriminates against the majority.'" *Smyer v. Kroger Ltd, P'ship*, 2024 WL 1007116 at *3 (6th Cir. 2024) (citing *Murray v. Thistledown Racing Club, Inc*., 770 F.2d 63, 67 (6th Cir. 1985)); *see also Leadbetter v. Gilley*, 385 F.3d 683,690 (6th Cir. 2004) (Explaining that, under modified framework for reverse-discrimination claim based on gender, the plaintiff must show that the defendant is "the unusual employer who discriminates against men.").

In such reverse-discrimination cases, to satisfy the first prong of the prima facie case, the plaintiff must 'demonstrate background circumstances [to] support the suspicion that the defendant is that unusual employer who discriminates against the majority." *Sutherland v. Michigan Dept. of Treasury*, 344 F.3d 603, 614 (6th Cir. 2003).  "To satisfy the burden of

demonstrating background circumstances that give rise to a suspicion of discrimination against the majority in employment, the plaintiff may present evidence of the defendants' unlawful consideration of race [or gender] in employment decisions in the past.*" Id.; see also Johnson v. Metropolitan Gov't of Nashville and Davidson Cnty., Tenn.*, 502 F. App'x 523, 536 (6th Cir. 2012) (Explaining the background circumstances "requirement is not onerous, and can be met through a variety of means, such as statistical evidence; employment policies demonstrating a history of unlawful racial [or gender] considerations; evidence that the person responsible for the employment decision was a minority; or general evidence of ongoing racial [or gender] tension[s] in the workplace."); *Treadwell v. Am. Airlines, Inc*., 447 F. App'x 676, 679 (6th Cir. 2011) (requirement can also be met by evidence that the defendant treats the majority employees less favorably with respect to lower pay, less vacation time, more overtime, or fewer promotions.).

To satisfy the fourth prong of a prima facie case in a reverse-discrimination case, the plaintiff must show that the defendant treated differently employees who were similarly situated but were not members of the protected class (ie, women).  *Leadbetter*, 385 F.3d at 690.  Those first and fourth prongs should be analyzed separately, as "[s]howing that similarly situated employees of [the opposite gender] were treated differently than the plaintiff is an independent evidentiary requirement ... holding that such evidence also satisfies the background circumstances requirement would collapse a four-legged test into a three-legged one." *Treadwell,* 447 F. App'x at 679.

In its motion, Defendant discusses the above modified framework that is to be applied to Plaintiff's reverse gender discrimination claim in this case.  Defendant asserts that Plaintiff

cannot meet his burden of establishing the background circumstances that give rise to a suspicion of reverse gender discrimination.

In response to Defendant's motion, Plaintiff has not presented any evidence that GM has unlawfully considered gender in employment decisions in the past.  Plaintiff has not presented the Court with any statistical evidence that would reflect an anti-male bias at GM, and the evidence provided by Defendant reflects that seven out of the eleven CVEs who reported to Van Vliet (and then Carleton) were male.  Plaintiff has also not provided any evidence of any ongoing gender-related tensions at GM or any evidence that female employees receive preferential treatment in terms of salary, overtime or vacation time, or job promotions.

Rather, Plaintiff appears to assert that he can meet that requirement by virtue of: 1) Carleton having assigned him some work that had previously been performed by female colleagues; 2) Plaintiff's supervisor Van Vliet (a male) having been replaced by Casey Walters (a female); 3) Carleton having not responded to Plaintiff's email complaining about the year-end performance review that Van Vliet, his prior supervisor (a male), gave him; and 4) GM allowing employee resource groups (that are open to all employees) related to various minorities (eg, LGBTQ, disabled persons, Latino, African American, and women) but not offering a group that is exclusive to men.  (Carleton Dep. at 55-57).  Plaintiff has not directed this Court to, and this Court has not located, any legal authority to show that this kind of evidence is sufficient to meet the background circumstances requirement in relation to a reverse gender discrimination claim.

And although Carleton (a female) was involved in the decision to terminate Plaintiff, Carleton was also the person who hired Plaintiff.  Under the same actor inference, a lack of discrimination can be inferred from the fact that the same individual both hired and fired the

employee. *See Cutcliffe v. Wright State Univ.*, 2019 WL 316909 *8 (S.D. Ohio. 2019) (citing *Buhrmaster v. Overnite Transp. Co.*, 61 F.3d 461, 464 (6th Cir. 1995)).

Accordingly, Plaintiff has not met his modest burden of demonstrating background circumstances that give rise to a suspicion of reverse gender discrimination.

Moreover, even if he could do so, Plaintiff cannot establish that Defendant treated similarly situated female CVE's more favorably than Plaintiff.

To do so, Plaintiff must "show 'that he and his proposed comparators were similar in all relevant respects and that he and his proposed comparators engaged in acts of comparable seriousness.'" *Bates v. American Axle, supra*, at * 2 (citing *Bobo v. United Parcel Serv., Inc.*, 665 F.3d 741, 751 (6th Cir. 2012)).  When a termination is disciplinary in nature, the plaintiff must show that his proposed comparators engaged in acts of "comparable seriousness." *Wright v. Murray Gurad, Inc.*, 455 F.3d 702, 710 (6th Cir. 2006).  To make this assessment, the Court looks to factors such as whether the individuals have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.  *Id.* (citations omitted).

As best as this Court can discern from his response, Plaintiff identifies Diane Tobey and "Jose Christy" as the similarly situated females who were not terminated despite having engaged in the same conduct.  (*See* Pl.'s Br. at 12).  Plaintiff has not presented the Court with any evidence that a female named Jose or Josie Christy was ever employed as a CVE at GM during his employment.  (*See also* Carleton's Dep. at 67-68).

Moreover, as Defendant notes, none of the four female CVEs were similarly situated to

24

Plaintiff because none of them struggled with the same performance issues as Plaintiff.  No female CVE received a "partially achieves expectations" or was placed on a written Plan For Improvement ("PFI") during Plaintiff's employment at GM.  Such differences in disciplinary history and evaluations show that the alleged comparators are not similarly situated.  *See, eg., Tennial,* 840 F.3d at 304; *Campbell,* 23 F. App'x at 325; *Okakpu-Mbah, supra,* at *5; *Bates v. American Axle, supra*, at *3.

Plaintiff has therefore failed to establish a prima face case of reverse gender discrimination and Defendant is entitled to summary judgment in its favor.[5]

### III.   The Court Grants Summary Judgment In Defendant's Favor As To The Additional Claims Raised By Plaintiff.

In addition to addressing the four counts included in Plaintiff's Complaint, Defendant's motion addresses additional claims, and seeks summary judgment as to those too.

#### A.      Section 1981 Retaliation Claim

Plaintiff's complaint includes four different counts – none of which asserts a retaliation claim.  Yet Plaintiff's *pro se* complaint does use the word "retaliation" in the body of it.  (Compl. at 6).

During Plaintiff's deposition in this case, Plaintiff stated that he is asserting a retaliation claim against GM:

---

[5]In addition, even if Plaintiff could establish a prima facie case, Defendant would still be entitled to summary judgment as to this claim because Plaintiff has not submitted sufficient evidence from which a reasonable jury could conclude that Defendant's stated legitimate, nondiscriminatory reason for Plaintiff's termination (Plaintiff's "subpar work performance in 2021") is a pretext for unlawful gender discrimination.

Q.     You are suing General Motors about this conversation.  What was said?

A.     I'm not suing General Motors about this conversation.  I'm suing General Motors because he retaliated against me for complaining about that conversation.

Q.     I don't think you are but

A.     It's called retaliation.  You know that's against the law?

Q.     You know you don't have a claim for retaliation, right?

A.     I do.

Q.     Well, let's talk about this.  So what was inappropriate about the conversation?

A.     You'll have to read the court complaint. It might be audio on it, too.

Q.     You might, you need to read the court complaint.

(Pl.'s Dep. at 231-32).  Plaintiff testified that, during a work-related conversation, Mr. Kiser made a comment about Mr. Schweikert having a new born child at home.  During that conversation, Kiser made a joke about taking on Schweikert's work while Schweikert went on paternity leave.  (Def. & Pl.'s Stmts. at ¶ 46-49).  Plaintiff viewed the comments as inappropriate because it was injecting a personal matter into a work conversation.  (Pl.'s Dep. at 230-234). Plaintiff testified that Van Vliet was "silent" when the comments were made during the work meeting.

On February 9, 2022, Plaintiff sent an email to Michelle Hicks with GM's Human Resources Department, asserting that Van Vliet failed to follow GM's internal policies (the "We are GM training Module 4") when he remained silent during the February 8th meeting.  (ECF No. 42-14).  Plaintiff stated that Van Vliet responded to Plaintiff's complaint to him by saying the comments at issue were made among friends and were not inappropriate.  Plaintiff's email asked that "someone encourage Bruce to follow the GM Behaviors in our group as our Engineering Group Manager."  (*Id.*)

Plaintiff's response brief indicates that the retaliation claim he wishes to bring is brought under 42 U.S.C. § 1981.  (*See* Pl.'s Br. at 6).  In his brief, Plaintiff identifies his February 9,

26

2022 email to Hicks as his "protected activity" that would support his retaliation claim.  (Pl.'s Br. at 7).

As Defendant argues in its motion, even if it had been included in his complaint, Plaintiff's retaliation claim fails for several reasons.  The Court need not address them all.

"42 U.S.C. § 1981 prohibits an employer from retaliating against an employee for opposing *racial discrimination*."  *Herrera v. Churchhill McGee, LLC*, 545 F. App'x 499, 500 (6th Cir. 2013) (emphasis added).  Section 1981 retaliation claims are governed by the same standards as Title VII retaliation claims.  *Id*. at 500-501.  A plaintiff may make a prima facie case of retaliation by showing that: 1) he engaged in activity protected by § 1981; 2) the protected activity was known to the defendant; 3) the plaintiff was subject to a materially adverse action; and 4) there was a causal connection between the protected activity and the adverse action.  *Id.*

Here, Plaintiff has not presented the Court with any direct evidence to support his § 1981 retaliation claim.  This claim also fails under the circumstantial evidence approach.  As a threshold matter, Plaintiff has failed to present any evidence to establish that he *engaged in protected activity under § 1981.*  Plaintiff identifies his February 9, 2022 email to Hicks as the protected activity that supports his retaliation claim.  That email, however, *makes no reference whatsoever to race or racial discrimination*.  Plaintiff's complaint about Van Vliet not following an internal GM policy, and allowing employees to discuss personal matters during a work-related conversation, is not protected activity under § 1981.[6]

Plaintiff also has not provided sufficient evidence to create an issue of fact as to a causal

---

[6]In addition, Plaintiff failed to administratively exhaust a § 1981 retaliation claim, as the record evidence reflects that Plaintiff did not include any kind of retaliation claim on his EEOC charge.  *See, eg., Kuhn v. Washtenaw Cnty.*, 709 F.3d 612, 627 (6th Cir. 2013).

connection between the alleged protected activity (his February 9, 2022 email) and the alleged adverse action. Plaintiff claims that, in retaliation for his email complaint, Van Vliet retaliated against him by including false statements about Plaintiff in his year-end performance evaluation. (Pl.'s Br. at 7). But Plaintiff's 2021 year-end review was completed and finalized before the end of the year in 2021. (Def. & Pl.'s Stmts. at ¶ 39). Thus, the alleged protected activity occurred *after* the adverse action alleged by Plaintiff. That is fatal to Plaintiff's retaliation claim because "[p]rotected activity that occurs after an adverse action cannot form the basis of a retaliation claim." *Simmons v. Ohio Rehab. Svs. Comm'n*, 2015 WL 13926948 at \*3 (6th Cir. 2015) (citing *Weatherby v. Federal Express*, 454 F. App'x 480, 492 (6th Cir. 2012).

Accordingly, Defendant is entitled to summary judgment in its favor as to Plaintiff's retaliation claim.

### B.     Race And Gender-Based Hostile Work Environment Claim Under Title VII And Section 1981

Plaintiff's complaint includes four separate counts, but does not contain a count asserting a hostile work environment claim. Plaintiff does, however, use the phrase "hostile work environment," in the body of his complaint. (Compl. at ¶ 25).

Plaintiff's response brief indicates that Plaintiff wishes to bring a hostile work environment claim, based upon his race and gender, under Title VII and § 1981. (Pl.'s Br. at 9 & 11). Plaintiff asserts that "he was subjected to harassment by Van Vliet and Carleton, and this harassment was motivated by Plaintiff's race and gender." (Pl.'s Br. at 9).

A "hostile work environment" occurs "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' . . . that is 'sufficiently severe or pervasive enough to alter the conditions of the victim's employment and create an abusive working

28

environment.'" *Schlosser v. VRHabilis*, LLC, 113 F.4th 674, 683 (6th Cir. 2024) (citations omitted). To prevail on his hostile work environment claim under Title VII or § 1981, Plaintiff must show that: 1) he was a member of a protected class; 2) he was subjected to unwelcome harassment; 3) the harassment complained of was based on race and gender; 4) the charged sexual harassment created a hostile work environment; and 5) the employer is liable. *Id.*

Defendant contends that it is entitled to summary judgment because Plaintiff has not come forward with sufficient evidence of any harassment based on race or gender. The Court agrees.

As the purported harassment he was subjected to, Plaintiff alleges that his PFI required him to attend "all 'PDT meetings,'" when some of the meetings allegedly overlapped. (Compl. at ¶ 19; Pl.'s Br. at 9). As Defendant notes, for the harassment to violate the law, it must be based on the legally protected characteristic at issue (here, Plaintiff's race or gender). *See Bowman v. Shawnee State Univ.*, 220 F.3d 456, 464 (6th Cir. 2000) (Agreeing with district court that "many of the alleged harassing acts cannot be considered in the hostile work environment analysis because [the plaintiff] has not shown that the alleged harassment was based upon his status as male," and explaining this is because the law "distinguish[es] between harassment and discriminatory harassment in order to 'ensure that Title VII does not become a general civility code.'")

The claimed harassing conduct here has no connection with Plaintiff's race or gender and Plaintiff has not come forward with evidence of a single comment that would reflect an anti-male bias. And Van Vliet having used the phrase, "it's black or white," on a single occasion, would be insufficient to establish severe and pervasive harassment, even if it were construed as a racial

comment.  Defendant is entitled to summary judgment as to Plaintiff's hostile work environment claim.

## CONCLUSION & ORDER

For the reasons set forth above, the Court GRANTS Defendant's summary judgment motion and all of Plaintiff's claims ARE DISMISSED WITH PREJUDICE.

IT IS SO ORDERED.

s/Sean F. Cox
Sean F. Cox
United States District Judge

Dated:  October 16, 2024

I hereby certify that a copy of the foregoing document was served upon counsel and/or the parties of record on October 16, 2024, by electronic and/or ordinary mail.

s/J. McCoy
Case Manager